**UNITED STATES of America**

v.

**Claude Vinson ROGERS.**

**Crim. No. 74–165–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.
Jan. 3, 1975.

J. Brian Donnelly, Asst. U. S. Atty., Norfolk, Va., for plaintiff.

Reid M. Spencer, Norfolk, Va., for defendant.

## OPINION

KELLAM, Chief Judge.

The defendant was indicted on July 10, 1974, for conspiring to distribute cocaine, for possessing cocaine with the intent to distribute, and for distributing cocaine. 21 U.S.C. § 841 and § 846 (1972). The defendant has moved this court to suppress the introduction into evidence of certain materials seized from him in what he alleges was an illegal search of himself, and of his car, apartment and locker at his place of work.

In July of 1974, Rogers was a civilian employee of a civilian company doing work at the Power and Desalinization Plant located on the United States Naval Base at Guantanamo Bay, Cuba. This

work was being performed pursuant to a contract with the Navy. On July 2, 1974, Rogers was at work at the Desalinization Plant. Between 2:00 p. m. and 2:30 p. m., Rogers was approached by Special Agents Hartman and Nichols of the Naval Investigative Service (hereinafter NIS). They asked Rogers to step outside and talk with them in the plant parking lot so as to avoid embarrassing Rogers in front of his fellow workers, and Rogers voluntarily complied. In the parking lot Rogers took from his pockets his billfold, pocket knife and another item, which he put onto the front seat of the NIS car.[1] He was thereafter patted down. The items which Rogers removed from his pockets were placed in a cloth and carried, with Rogers, with Rogers' consent, to the NIS office. He was given the Miranda warnings. The time was approximately 2:45 p. m.

Hartman asked Rogers for permission to conduct a search of his personal effects, his apartment, his car, and his locker at the plant. Rogers gave his consent orally and was then given a form to sign which stated this consent in print. Rogers objected to the language that allowed the NIS agents to remove any personal property or papers, and this phrase was crossed out substituting instead that Rogers gave permission to remove "evidence of narcotics drug marijuana use sale & possession." Rogers then signed the consent form. After Rogers signed the consent form, Hartman found a piece of paper in Rogers' wallet with some names and weights on it. When this was observed, a comment about it was made. Rogers orally revoked his permission to search any further. Hartman ceased his search of Rogers' wallet and the other items which Rogers had taken from his pockets. Rogers requested appointment of counsel.

Rogers was then taken to the office of Lieutenant Holz, a Navy lawyer in the Judge Advocate General Corps, who then gave advice and assistance to Rogers.[2] The time was approximately 3:30 p. m.

Rogers, Hartman, and other unnamed NIS agents proceeded to the office of the acting commanding officer, Commander Federico, to obtain a Command Authorization for Search and Seizure. Hartman presented a Request for Authority to Search, which detailed the reasons why Hartman thought a search was legally justified. It also appears that Hartman supplemented his written reasons with an oral presentation setting out the background of the investigation. This oral presentation was never recorded. The Command Authorization for Search and Seizure was issued by Commander Federico. NIS agents then proceeded to search Rogers' apartment, car and locker at the plant.

At 6:00 p. m. on July 2, Rogers was actually placed under arrest and was at that time so informed.

On July 3, Hartman presented a second Request for Authority to Search. The July 3 request did not state with elaborate detail the underlying reasons for the search—as the July 2 request had done—but briefly stated that items observed on the July 2 search were inadvertently not seized, and permission was sought to now enter Rogers' apartment to obtain them. Commander Federico signed a Command Authorization and a second search and seizure was conducted.

The Court is faced with two major issues. The first is by what authority the United States Navy may search the property of a civilian who resides on base and is performing work for the Navy. The second issue is whether the Navy conducted a legally valid search pursuant to the applicable laws regarding searches and seizures.

---

1. Rogers testified that he was asked to remove a notebook from his pocket inside the plant, while Hartman testified to the contrary. The Court has found that Rogers was not searched for said notebook.

2. Hartman testified that Rogers had been previously offered the right to counsel, but this had been rejected. Subsequent to Hartman finding the slip of paper, Rogers then requested the assistance of counsel.

## I

■ The initial issue before us is whether Rogers, as one serving on a military base, is susceptible to the same search and seizure process as military personnel, or whether he is entitled to the full protections of the Fourth Amendment. For the reasons given below we find that Rogers, as a civilian, retains those substantive rights guaranteed by the Fourth Amendment. However, the Court specifically finds that as long as the military respects the rights guaranteed by the Fourth Amendment's prohibition against unreasonable searches and seizures, the military need not be bound by all of the procedural formalities that are imposed upon civilian law enforcement agencies.

The United States Naval Base at Guantanamo Bay was obtained through a leasing agreement in 1903. By the lease, Cuba agreed that the United States should have complete control over criminal matters occurring within the confines of the base. It is clear to us that under the leasing agreement, United States law is to apply. Our conclusion is bolstered by the fact that the United States no longer diplomatically recognizes Cuba, thereby eliminating any recourse the Navy might have to look to the "host" country for enforcement of the criminal law.

Navy Regulations in effect in July, 1974 required base commanders to hold for civil authorities any person not subject to the Uniform Code of Military Justice (UCMJ) who was believed to be responsible for mere suspicious occurrences on the base. Navy Regulations, 1973, § 0713. Navy Regulations further charged the commanding officer with preventing the illegal importation of marijuana, narcotics, or other controlled substance onto the base. These regulations had the force and effect of law, Cafeteria Workers v. McElroy, 367 U.S. 886, 891, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), and, not being inconsistent with any constitutional provision, created a basis of authority upon which Commander Federico could act.

Counsel for defendant argue that it has been decided that a military-type search is invalid where the object of the search is a civilian. Saylor v. United States, 374 F.2d 894, 179 Ct.Cl. 151 (1967). In *Saylor*, a civilian employee in charge of booking entertainment at various military bases in Japan, was fired for misconduct. Much of the basis for the dismissal was evidence obtained from a military-type search of his on-base housing, his car, and his office. Saylor sued for reinstatement with back pay, and the Court of Claims had to consider the validity of the search. Briefly, the search, which would have been valid as to military personnel under the then existing military regulations, was a general search made in the course of an investigation. It was not a search based upon a finding of probable cause, and no oath or affirmation was given in connection with the execution of the "Authority to Search" document. There was no limitation of the items to be seized, nor was there any description of the items sought. Saylor v. United States, *supra*, at 895–896.

The Court of Claims, in deciding that this was not an instance in which the commanding officer had unlimited authority to order a search of the base, United States v. Grisby, 335 F.2d 652, 654–655 (4 Cir. 1964), held that as a civilian, Saylor retained his civilian rights to a search that was reasonable under the Fourth Amendment. Saylor was not subject to the provisions of the UCMJ or the Manual for Courts Martial. McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960); Grisham v. Hagan, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1961).

We disagree that *Saylor* is applicable in the case before us for two reasons. First, on the facts, we are not faced with nearly the outrageous conduct that confronted the Court of Claims in *Saylor*. In looking at defense exhibits A, B, C and D (especially C), the Court finds that the investigating agents supplied Commander Federico with extensive

reasons justifying the search of Rogers' apartment, car and locker. The Request for Authorization to Search listed the items to be seized. Finally, looking outside of the exhibits, the testimony establishes that the search was not a general search, as in *Saylor,* where the Government investigators were merely on a "fishing expedition." In Rogers' case, Rogers had been the object of a Government investigation for quite some time, and the NIS agents intended the search as a culmination of their investigation. When they requested the search, they knew just what they were looking for and so stated in exhibit C, paragraph 4. Thus, absent the outrageous conduct apparent in *Saylor,* we do not feel that we should apply *Saylor* to invalidate, as a rule of law, a military-type search of a civilian employee.

A second reason we find *Saylor* inapplicable is that the military has greatly revised its procedure for conducting a search and seizure. The Manual for Courts Martial (1969 Rev.) requires probable cause to authorize a search, and paragraph 152 extensively defines probable cause. Paragraph 152 also sets out how to evaluate "tips" given by informants, and that "underlying circumstances" establishing reliability must be shown. Thus, the military-type search in *Saylor* was far different than the search in Rogers' case, and for that reason, also, we do not accept the defense counsel's suggestion that we apply the holding in *Saylor* to rule that military-type searches are *per se* invalid when performed upon the military's civilian employees.

 However, this Court does not rule that the military may search its civilian employees or their personal property pursuant to military procedure where that procedure violates the reasonableness standard of the Fourth Amendment. It is for this reason that we reject the Government's argument that the

case of Best v. United States, 184 F.2d 131 (1 Cir. 1950), should govern here. *Best* involved the United States Army's search of the apartment of a United States citizen who was a known collaborator with the Germans. The search occurred in Vienna, Austria, right after the end of World War II. Under those circumstances, the First Circuit held that a search conducted pursuant to military regulations was valid even though clearly violative of the Fourth Amendment's requirements. The argument of the Government now, if we understand it, is that *Best* should be applied broadly to hold military-type searches valid where no civilian authority is available—such as at Guantanamo Bay, Cuba. We reject *Best* as being so factually distinguishable as to be inapposite here. In doing so we reiterate our holding made earlier in this opinion that, absent the extreme circumstances in *Best,* a military-type search may be conducted upon a civilian employee only if the search is reasonable under the Fourth Amendment.[3]

## II

Having decided that the military has the authority to search Rogers' apartment, car and locker, we must now turn to the facts of the search to determine whether or not it was reasonable under the Fourth Amendment. It is the opinion of the Court that the search was reasonable, and the evidence seized therefrom will be admitted into evidence.

 The Supreme Court has, in the last decade, discussed at length the requirements placed upon civilian law enforcement agencies by the Fourth Amendment. To properly obtain a search warrant, a neutral and detached magistrate must determine probable cause exists from facts or circumstances presented to him under oath or affirmation. Probable cause may be shown by

3. This is not to say that civilians come under the authority of the UCMJ or the Manual for Courts Martial. What we do hold is that a search performed upon a civilian pursuant to military regulations may be valid if it is nevertheless reasonable under the Fourth Amendment.

information that is the personal knowledge of those seeking the search warrant, or it may be based upon information supplied by an informant if the informant can authenticate his source. The warrant must note on its "four corners" all of this information. Further, the warrant must describe with reasonable specificity items to be seized, and must limit the search to those places where the items sought are likely to be found. Finally, the warrant must require that a list of the items seized be handed over to the authorizing magistrate. *See* Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and the cases cited therein.

 In examining the facts in the case before us, Commander Federico does qualify as a neutral and detached magistrate for the purpose of determining probable cause. This much was conceded by the defendant on page 19 of his brief, citing Wallis v. O'Kier, 491 F.2d 1323 (10 Cir. 1974). Probable cause was shown in the Request for Authority to Search. Although much of the information given by Hartman was supplied to him by informants, Hartman did show sufficient underlying facts to authenticate their information. The three informants related facts from their own personal knowledge. One actually felt the letter that the NIS agents were on the lookout for, and described the contents as a "powdery substance". One other informant admitted to personally having bought cocaine from Rogers. This was not rumor or hearsay, but firsthand evidence.

 Three objections are raised to the finding of "probable cause" by Commander Federico. The first is that since Hartman orally told Federico of information not in the written summation, and this may have influenced Federico, the Command Authorization for Search and Seizure is based upon non-recorded information. This objection is without merit as, regardless of what Hartman orally conveyed, the written summation did exhibit probable cause. The second objection is that Commander Federico, at testimony before the Court, acknowledged that he did not weigh Hartman's information against the Navy Regulation standard of probable cause, and therefore the Command Authorization was not based upon a finding of probable cause. We also disagree with this contention. Although, admittedly, Commander Federico did not know the technical requirements of "probable cause", he did testify that he thought that from the facts set forth a search was justified, and in his layman's understanding of the technical terms involved, a reasonable suspicion equated with a finding of probable cause. Moreover, we do not feel that a finding of probable cause requires "intent". Since the appropriate question is whether there is probable cause on the "four corners" of the document, we return to our finding that the written summation did exhibit probable cause regardless of Commander Federico's lack of legal expertise. The third objection is that since the written summation establishing probable cause was only on the Request for Authority to Search and was not reiterated on the paper authorizing the search, probable cause is not actually on the "four corners" of the search warrant. Again, we do not agree with this contention. The purpose of a written summation is to insure that a court reviewing a magistrate's finding of probable cause will have more to rely upon than the mere remembrances of the magistrate involved. This is for the protection of the rights of the individual who is the subject of the search. In the case before us, the summation of probable cause was reduced to writing and did remain in the possession of the "detached magistrate," the commanding officer. To require that a Command Authorization to Search is invalid as to Rogers merely because the summation was not reiterated on that document is to exalt form over

substance, which we will not do. The substance of Rogers' right to have probable cause shown on the "four corners" has been granted.

The Command Authorization for Search also stated with reasonable specificity the items to be seized. Admittedly, the letter suspected of containing cocaine was not specifically mentioned in the Command Authorization for Search, but we reiterate the point made above that the letter was specifically stated in the Request for Authority, and we feel that, read together, the Request to Search and the Command Authorization for Search protect Rogers from the general type of search condemned in Saylor v. United States, *supra*. Further, the Request to Search and Command Authorization limited the search to those places where the items sought were likely to be found, and a signed receipt was required, containing a full description of each and every item seized.

[11] Finally, Agent Hartman did not present the evidence under oath from which Commander Federico was to determine probable cause. That this is required of civilian law enforcement agencies is without question. United States Constitution, Amend. IV; Aguilar v. Texas, *supra*, 378 U.S. at 112, 84 S.Ct. 1509. On the other hand, the military procedure does not require that an oath or affirmation be given. Weighing all of the considerations involved in this extremely close question, we are of the opinion that the military procedure was adequate to protect Rogers from an unreasonable search and seizure.[4]

Defense counsel also urge that that the second search, made on July 3, is invalid because of the "fruits of the poisonous tree" doctrine. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Since we do not find that the first search was invalid, this doctrine is inapplicable. Also,

reading the Command Authorization of July 3, in connection with the other documents, we find that the July 3 search was valid in its own right.

Accordingly, defendant's motion to suppress is hereby denied.

---

4. Under other circumstances, the Supreme Court has held that military procedure, which was admittedly more summary than would be required of a nonmilitary organization, nevertheless satisfied constitutional requirements. Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (alleged denial of due process).